Filed 6/23/26  P. v. Romo CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>AARON STEVAN ROMO,<br><br>     Defendant and Appellant. | G064357<br><br>(Super. Ct. No. 23NF0724)<br><br>O P I N I O N |

          Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge. Affirmed.

          Patrick Morgan Ford for Defendant and Appellant.

          Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Eric Swenson and Monique Myers, Deputy Attorneys General, for Plaintiff and Appellant.

*          *          *

Defendant Aaron Stevan Romo choked his girlfriend's neck with his bare hands until she was dead (manual strangulation). Romo had previously committed multiple acts of domestic violence against his girlfriend and six other women. The People charged Romo with first degree murder.

At trial, Romo testified that although he did not remember what happened, he did not kill his girlfriend. Conversely, Romo's counsel urged the jury to return a verdict of voluntary manslaughter (heat of passion) as a lesser included offense. The jury found Romo guilty as charged. The trial court imposed a prison sentence of 25 years to life plus five years.

On appeal, Romo claims there is insufficient evidence of premeditation to support his first degree murder conviction, and there is insufficient evidence of malice to overcome his voluntary manslaughter defense. We disagree and affirm the judgment.

I.

FACTS AND PROCEDURAL BACKGROUND

We will first summarize Romo's prior acts of domestic violence, and then summarize the events surrounding Romo's killing of his girlfriend Mirelle Mateus (Mirelle) on March 17, 2023.

*Prior Acts of Domestic Violence* (*Six Other Victims*)

In 2007, Gabriela N. began dating Romo. They had met in high school. Romo became "physical" with her and he was "very violent." When Gabriela was six months pregnant, Romo punched her. Romo would routinely become enraged and would physically assault Gabriela by pulling her hair, grabbing her by the arms, and grabbing her by the throat. In 2009, Gabriela obtained a restraining order and ended the relationship. After that, Romo

threatened to commit suicide if she did not go out with him again.

In 2009, Laura D. began dating Romo soon after she graduated from college. Romo's behavior became volatile and violent. On one occasion, Romo got upset at Laura and he threw a bottle of vodka at her. On another occasion, Romo smashed her phone. Laura ended the relationship after about five years. Romo continued to contact Laura after she asked him to stop.

In 2012, Robin B. began a relationship with Romo. In May 2014, Romo was arrested for a domestic violence incident involving Robin and she obtained a restraining order. In July 2014, and again in March 2016, Romo was arrested for violating the restraining order.

In 2018, Sarah A. married Romo. [1] At some point, Sarah served a restraining order upon Romo. In 2022, Romo's friend J.W. saw Romo drag Sarah by the hair. Sarah later made allegations in court papers that Romo had broken her phone, punched her multiple times, pointed a gun at her, pinned her down and choked her, and threatened to kill her.

In 2021, Elizabeth P. met Romo in Las Vegas. Elizabeth lived in Missouri, where Romo went to visit her. In 2022, Elizabeth obtained a restraining order based on allegations of Romo's stalking or harassment.

In September 2022, Stephanie R. met Romo on a trip to Mexico, and they began dating on their return to California. Stephanie lived in Temecula; Romo lived in Anaheim. One time in a nightclub, Romo pulled her to the ground by her hair because she was talking to a guy. Stephanie broke up with Romo several times between October 2022, and March 2023, but he continued to contact her. Stephanie considered getting a restraining order.

---

[1] At the time of the trial in this case, Sarah was still married to Romo, and they were going through divorce proceedings. Sarah invoked the marital privilege and refused to testify.

*Prior Acts of Domestic Violence* (*Mirelle*)

In June or July 2022, Mirelle moved in with Romo after dating him. In early September, they went on a trip together in Hawaii. Mirelle called her mother on Romo's phone and was crying. Mirelle said Romo had hit her and broken her phone "[b]ecause he was very jealous." Mirelle's mother urged her to come home, but Mirelle stayed in Hawaii for the rest of the trip. In late September, after they got home, Romo gave Mirelle a black eye. Mirelle told her mother that she wanted to leave Romo.

During the relationship, Mirelle would routinely move back in with her mother for a few days, and then would return to Romo. In October 2022, at about 2:30 a.m., Romo came to the mother's home looking for Mirelle. When she and her mother opened the front door, Romo had a gun pointed toward his chin, and he was threatening to kill himself if Mirelle did not go back with him. Mirelle closed the door and Romo fired the weapon. When they opened the door, Romo had left and Mirelle's mother later found a shell casing in front of the door. Mirelle's mother did not call the police because Romo routinely threatened to kill himself and "he was a coward."

On December 5, 2022, Mirelle and Romo got into an argument at their apartment while two other people were present, and the police were contacted. During the argument, Romo had a handgun tucked into the back of his pants and pushed Mirelle to the ground. Mirelle wanted to leave and Romo would not let her; at one point Romo threw Mirelle off of a first floor, four-foot high patio railing into a driveway area. The police arrived and saw Mirelle in the driveway. Mirelle was crying and had a cut to her leg. Romo had fled from the scene. Romo was later arrested and went to jail; Mirelle got a restraining order. Romo was released on a $100,000 bond (he was still out of jail on the bond in March 2023).

4

After the December 5, 2022, incident, Mirelle moved back into her mother's house, and she said that she no longer wanted to be with Romo. Nonetheless, Romo and Mirelle went on a ski trip together in February 2023, and Mirelle continued to occasionally stay with Romo until March 2023.

*Events Surrounding Mirelle's Killing*

On March 16, 2023, in the late afternoon, Mirelle went to Romo's apartment and had her name formally taken off the lease. Romo texted his friend J.W. and suggested they go out that night to take his mind off of Mirelle. J.W. drove to Romo's apartment, where they had "a couple of drinks" before taking an Uber to a bar about three miles away. J.W. was not sure how much they had to drink at Romo's apartment, but it appears they split two-thirds of a bottle of tequila.

At about 10:30 p.m., Romo and J.W. arrived at the bar. They stayed at the bar for about three to four hours, and they each had about four to six drinks. At about 1:30 a.m., Romo said something offensive to a young woman who slapped him; security guards then walked Romo out of the bar.

While Romo and J.W. were standing outside of the bar waiting for an Uber, Romo called an African American bouncer "the n-word," and a fight broke out. Romo was knocked to the ground, where several people took punches at him. The fight ended after about 20 to 30 seconds. Romo was dazed and had injuries to his face. Police arrived, but Romo said he was fine and declined medical attention. An officer later testified that Romo was not grossly intoxicated or unable to care for himself.

During the fight, Romo lost his phone. After talking to the police, the Uber arrived and Romo waited inside the car while J.W. looked for

Romo's phone. Romo borrowed the Uber driver's phone and called Mirelle seven times between 1:52 a.m. and 2:01 a.m. Romo was overheard trying to convince Mirelle to pick him up so that he could see her. After about 10 to 15 minutes, Mirelle arrived and drove Romo back to his apartment; J.W. separately took the Uber back to Romo's apartment.

At Romo's apartment complex there was a security guard at the entrance. When Mirelle arrived she got out of her car and approached the guard who said that "she looked distressed." Romo was standing near Mirelle's car with her phone and he was screaming. Mirelle told the guard that Romo had taken her phone and refused to return it. The security guard could see that Romo was looking at Mirelle's phone, and Romo said to Mirelle that "'you have guys hitting on you.'"

Mirelle asked the security guard to help her, and it was about this time that J.W. returned to the apartment complex in the Uber. Mirelle told the guard that she had a restraining order against Romo, and that he had just punched her in the car. J.W. saw that Romo had Mirelle's phone in his hand, and he heard Romo say that he was upset that Mirelle "had been texting a guy or something." J.W. tried to get Romo to give back Mirelle's phone, but Romo told J.W. "to stay out of it." J.W. eventually walked to his car and sat there because he was too intoxicated to drive.

At about 2:30 a.m., Romo went inside his apartment, and then stood on his patio. The security guard heard Romo tell Mirelle that she could have her phone back if she came inside. Mirelle said, "I'm not stupid, I'm not going to come inside." Although the guard urged Mirelle to stay with him, she climbed over the railing and stood on the patio. The security guard watched as Mirelle was quickly pulled inside the apartment; the guard described that Mirelle "got whiplash" due to being forcibly pulled inside.

6

The security guard called the Anaheim Police Department. After calling the police, the guard heard Mirelle scream for help at "the top of her lungs." At 2:44 a.m., the police were dispatched to an assault in progress. The police quickly arrived and talked to the guard who said, "'I'm kind of worried, like, I heard a boom and then she stopped screaming.'"

After being directed to the front door of Romo's apartment, an officer "heard kind of what sounded like someone having a conversation. It was muffled." The officer knocked on the door and announced that he was conducting a welfare check. After about five minutes of repeatedly doing this, the officer went to the patio and shined a flashlight inside the apartment, but the officer did not see anything. At about 3:05 a.m., the police determined there were not exigent circumstances to make a forced entry and they left. At about 4:40 a.m., Romo left the apartment complex on his motorcycle.

Romo drove to Stephanie's house in Temecula, which was 65 miles away, and arrived sometime before sunrise. Romo had blood on his clothes and his face was bruised. Stephanie asked Romo what had happened, but Romo did not respond and "was very nervous." Stephanie asked if he had hit Mirelle and he repeatedly said, "'I want to die. I want to kill myself.'" Romo attempted to hang himself, and at another point he cut his wrist.

J.W. called Stephanie and told her that Mirelle's mother could not find her daughter. Stephanie pressed Romo on what happened to Mirelle. Romo asked Stephanie if she was recording him on her phone. After Stephanie assured Romo he was not being recorded, he confessed to ki1ling Mirelle. Romo told Stephanie he had strangulated Mirelle. Stephanie asked Romo, "'[D]id you try to do anything to revive her?'" Romo said that "he did CPR for 20 minutes." Police arrested Romo at Stephanie's home and emergency personnel transported him to Inland Valley Hospital.

*Police Investigation*

Mirelle's body was discovered in the bathroom of Romo's apartment. Police arrived and noticed drops of blood on the floor leading to the bathroom. There was a three-inch by two-inch hole in the bathroom door with blood underneath it. Mirelle's body was lying on the bathroom floor facing up. Romo's DNA was found on Mirelle's neck and under her fingernails. There was bruising on Mirelle's nose, eyes, and right knee. There was also a mark on Mirelle's neck consistent with her being choked.

There was blood on the bathroom floor, wall, and counter. There was a knife on the bathroom counter that matched a set of knives in the kitchen. A clump of Mirelle's hair was found under the vanity, and other clumps of hair were found in the apartment. Several of Mirelle's earrings were found scattered about the crime scene; a criminalist opined that Mirelle was assaulted with such force that they were knocked off. On the bathroom floor there was a shirt that matched what Romo had worn at the bar. Two messages were written on the bathroom mirror: "'I didn't want this. I love you. I want to die please.'" And also, "'Sorry Lieila.'" [2]

Mirelle's phone was found under a wicker basket by the front door of the apartment. Detective Julissa Trapp later saw a video on Mirelle's phone in which Mirelle was engaged in sexual activity with a man other than Romo. The video was date stamped March 13, 2023, but Trapp did not know when the video was created, or when it had been last viewed.

Detective Trapp interviewed Romo at the Anaheim Police Department after he had been released from the hospital, two days after he had killed Mirelle. Romo claimed to have no memory of what occurred after

[2] Romo has a daughter by the name of Leila (the girl's name was misspelled on the mirror).

arriving at the bar, until he was at Stephanie's home the following day. Toward the end of the interview, Trapp informed Romo that Mirelle was found dead in his apartment. Trapp later testified that she had done hundreds of death notifications during her career as a homicide detective. Trapp said the two questions virtually everyone asked were: "'What happened?'" and, in the case of a homicide, "'who did it?'" Romo did not ask either of those questions.

A forensic pathologist performed an autopsy noting that within Mirelle's eyes there were small burst blood vessels (petechiae). Mirelle had bruising and abrasions on her ear lobes, forehead, jaw, cheek, shoulder, and nose, which was broken. Mirelle had abrasions to her face consistent with someone applying pressure with their fingertips. Mirelle had multiple bruises and abrasions to the front of her neck. Mirelle had blood in her scalp, which was indicative of blunt force trauma. Mirelle had injuries to the back of her left hand, which were indicative of a defensive injury. Mirelle had no abrasions to her chest or any fractured ribs, which would typically be present if someone had performed CPR. There was a fracture in Mirelle's neck.

The pathologist later opined that the cause of Mirelle's death was manual strangulation. The pathologist testified that a person dies from strangulation because the pressure to the neck "doesn't allow blood to get to the brain." A victim first loses consciousness, but can remain alive if the restriction on the neck is released. However, if the neck remains constricted for a long enough period of time, death will result. When asked how long it takes for a person to die from manual strangulation, the pathologist said: "It's tough to give an exact number since everyone is different. We are typically taught that the brain can only survive for minutes in this situation. So minutes meaning more than one, but less than an hour."

9

*Court Proceedings*

The People filed an amended information charging Romo with murder (March 17, 2023), domestic violence causing corporal injury (December 5, 2022), false imprisonment (Dec. 5), and obstructing a peace officer (Dec. 5). The information alleged the homicide was committed while Romo was out on bail.

On April 24, 2024, a 17-day jury trial began. After the People presented their case-in-chief, the trial court dismissed the charge of obstructing a peace officer. Romo then testified on his own behalf, and called two expert witnesses.

On direct examination, Romo testified that he remembered going out with J.W. and getting into a fight at the bar, but he did not remember anything after that until he woke up at the hospital. Romo said he did not remember: going back to his apartment, anything that happened at his apartment, driving to Temecula on his motorcycle, seeing Stephanie that night, or being transported to the hospital. Romo testified that he would not have misspelled his daughter's name on the mirror. As far as the events of December 5, 2022, Romo testified that he did not prevent Mirelle from leaving, he had no physical contact with her, and he did not throw her over the four-foot high railing. Romo said that he has never possessed a gun.

On cross-examination, Romo said that Gabriela lied about him abusing her. Romo testified that Stephanie's testimony about him previously pulling her to the ground by her hair "just didn't happen like that." Romo admitted he does have some trouble controlling his anger. Romo testified that he did not pull Mirelle's hair on their trip to Hawaii, but he did admit breaking her phone. Romo said that while in Hawaii he never hit Mirelle, put his hands around her throat, or threatened to kill himself. However, Romo

10

admitted he did argue with her because she talked to another man and that made him jealous. When the prosecutor showed Romo a picture taken in September of 2022, which showed Mirelle with a black eye, Romo said that he "couldn't tell you if I gave her that black eye."

Romo testified that he never struck his wife Sarah, but he did admit to pulling her hair. Romo admitted that he broke down a hotel room door during a trip to Las Vegas with Sarah, but he said he never threatened to kill her. Romo testified that Sarah's statements in court papers that he waved a gun at her, choked her, and punched her multiple times were all lies.

Romo testified that he did not kill Mirelle. Romo said that he never told Stephanie that he killed Mirelle, strangled her, or performed CPR. Romo said Stephanie was lying, even though he maintained a cordial relationship with her and kept in contact with her from jail following his arrest. Romo testified that his first memory after the fight was when he woke up at the hospital. Romo said that although he was handcuffed to the hospital bed, and the police were present for a couple of days, he never asked them "'what's happening, why am I here?'"

Dr. Jeff Vitoroff is a neurologist who testified on direct examination that he interviewed Romo, conducted a physical examination, reviewed the police reports and hospital records, and viewed the video of the fight outside of the bar. Vitoroff concluded Romo had suffered a concussive brain injury. As to memory loss, Vitoroff testified that based on what Romo had told him, he had a history of alcohol blackouts. Vitoroff also opined that Romo also had a history of traumatic brain injuries. Vitoroff opined that persons who have suffered traumatic brain injuries are vulnerable to aggression and loss of impulse control.

On cross-examination, Vitoroff agreed that people without brain

11

injuries can lack impulse control. Vitoroff acknowledged that if Romo gave him false information then his opinion may be flawed. Vitoroff agreed there was no information beyond Romo's statements showing a history of brain injuries. Vitoroff did not view the video of Romo speaking to an officer right after the fight. Vitoroff acknowledged that Romo had a brain scan at the hospital and the findings were normal. Vitoroff agreed he could not determine if Romo was malingering.

Darrell Clardy is a forensic toxicologist who testified on direct examination that he is an expert who routinely testifies as to the effects of alcohol on driving. Clardy had reviewed the reports and had spoken to Romo. Clardy opined that based on Romo's self-reported alcohol consumption, Romo had a blood-alcohol concentration (BAC) "in the range of a .25, .28 up to a .40 at the time he hit his peak, which would be around 2:30." Clardy testified that Romo's claimed memory loss was consistent with alcohol consumption.

On cross-examination, Clardy agreed that if the information he received from Romo was a lie, then his assumptions about his BAC may be completely inaccurate. Clardy acknowledged that in most cases in which he testifies he has the results of the defendant's BAC tests, but in this case there were none. Clardy agreed that most people are unconscious at a BAC of .25, and at above .30 there would be a severe risk of death. Clardy did not look at any videos prior to his testimony.

As a rebuttal witness, the People called Dr. Jeremy Lee Hogan, a neurologist who testified that a concussion and a traumatic brain injury are synonymous terms. Hogan had reviewed videos, Romo's medical records from the Inland Valley hospital, and his prior medical records. Hogan noted that Romo had suffered a concussion due to a car accident about six to eight years ago. Hogan noted that in the Inland Valley hospital records there was no

12

documentation of Romo having suffered a concussion.

Hogan agreed that Romo may have suffered a concussion during the fight outside of the bar; however, Hogan noted that the video with the officer right after the fight revealed that Romo was awake and alert and able to answer questions. Hogan testified that persons with concussions may have a memory loss, but "generally they have an overall sense of things that have happened. It would be unusual for a person with a concussion to say that they have absolutely no recollection of events for many hours." Hogan said that during an alcohol blackout people are unable to lay down new memories, but during this period they are ordinarily able to make decisions, and are generally aware of themselves and their surroundings.

The trial court instructed the jury on voluntary manslaughter as a lesser included offense of murder. The jury found Romo guilty of first degree murder, domestic violence causing corporal injury, and false imprisonment. In a bifurcated proceeding, the court found true the enhancement that he was out on bail when he committed the murder. The court imposed a prison sentence of five years plus 25 years to life.

## II.

## DISCUSSION

Romo claims there is insufficient evidence to support his first degree premeditated murder conviction, and there is insufficient evidence of malice to overcome his voluntary manslaughter (heat of passion) defense.

In this discussion we shall: A) state the deferential standard of review; B) consider Romo's claim regarding premeditation and deliberation; and C) consider Romo's claim regarding voluntary manslaughter.

13

*A. Standard of Review*

Under the sufficiency of the evidence standard of review we consider "the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact *could* find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27, italics added.)

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "The reviewing court presumes in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*Ibid.*)

The sufficiency of the evidence standard of review to support a criminal conviction is "highly deferential." (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [it]."'" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

*B. First Degree Murder* (*Premeditation and Deliberation*)

Romo claims there is insufficient evidence that he killed Mirelle with premeditation and deliberation. We disagree.

"Both first and second degree murder require proof of an unlawful killing committed with malice aforethought, but only the former

14

requires evidence of willfulness, premeditation, and deliberation." (*People v. Wilson* (2021) 11 Cal.5th 259, 296–297; accord, Pen. Code, § 189.)

"'Willful' is synonymous with 'express malice': in other words, a specific intent to kill. [Citation.] Premeditation occurs when the killing is "'considered beforehand,'" and deliberation occurs when the decision to kill is "'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'"" (*People v. Mejia* (2012) 211 Cal.App.4th 586, 604.)

As for premeditation and deliberation, "the requisite reflection need not span a specific or extended period of time. Thoughts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly." (*People v. Nelson* (2011) 51 Cal.4th 198, 213.) "'"The true test is not the duration of time as much as it is the extent of the reflection."'" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080; see *People v. Lenart* (2004) 32 Cal.4th 1107, 1127 ["Premeditation and deliberation do not require much time"].)

The Supreme Court has identified three categories of evidence related to premeditation and deliberation: (1) planning activity, (2) motive, and (3) the manner of killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27 (*Anderson*).) "The goal of *Anderson* was to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) However, "*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation. (*Ibid.*) "The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*Ibid.*)

15

As far as planning activity, it is a reasonable inference that Romo attempted to lure Mirelle into his apartment— a more secluded area where the security guard was not present—by promising to return her cell phone if she entered the apartment. (See *People v. Lucero* (1988) 44 Cal.3d 1006, 1018–1019 [there was "substantial evidence of premeditation related to planning activity" where "defendant lured or compelled the victims to enter" his home]; *People v. Hovarter* (2008) 44 Cal.4th 983, 1019 ["Defendant's choice . . . of committing his crimes in isolated or secluded settings further suggests a premeditated plan designed to avoid detection"].)

Further, the jury could have reasonably determined that Romo formed the plan to kill Mirelle as he was choking her. (See *People v. Disa* (2016) 1 Cal.App.5th 654, 666 ["evidence of planning may be inferred from the fact defendant 'deliberately continued to exert pressure on [the victim's] neck even after she went limp'"]; see also *People v. Lenart, supra,* 32 Cal.4th at p. 1127 ["Premeditation and deliberation do not require much time"].)

As far as motive, the record is replete with propensity evidence that Romo routinely committed domestic violence against his romantic partners. (Evid. Code, § 1109; *People v. Brown* (2011) 192 Cal.App.4th 1222, 1232 ["Section 1109, in effect, 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes'"].)

Here, there was evidence Mirelle had taken her name off the lease, and was presumably prepared to leave him, just hours prior to Romo strangling her. Based on this, the jury could reasonably infer that Romo had a motive to kill Mirelle out of anger. (*People v. Disa, supra*, 1 Cal.App.5th at p. 666 [evidence of motive where defendant killed his girlfriend because he was angry "over the apparent ending of their relationship"].)

16

As far as the manner of killing, the forensic pathologist who performed the autopsy testified that Mirelle's neck was choked to the point where it hemorrhaged, and "she had a fracture of the superior horn of her laryngeal cartilage." The pathologist testified that these injuries indicate that Romo must have exerted a large amount of force, and Mirelle's death could not have happened by Romo just briefly grabbing her neck. Moreover, the pathologist testified Romo must have applied sustained pressure on Mirelle's neck for over a minute (at a minimum) in order to kill her.

California law makes clear that evidence of manual strangulation is sufficient to establish a murderer's premeditation and deliberation. (*People v. Hovarter, supra,* 44 Cal.4th at p. 1020 ["This prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act"]; *People v. Disa, supra,* 1 Cal.App.5th at p. 666 ["As to manner of killing, defendant used a carotid restraint hold, which can render a victim unconscious within a few seconds and dead in a minute. This manner of killing may be viewed as demonstrating 'a calculated design to ensure death rather than an unconsidered explosion of violence'"]; *People v. Shamblin* (2015) 236 Cal.App.4th 1, 10–11 ["the California Supreme Court has held that strangulation as a manner of killing is sufficient evidence of premeditation and deliberation because its prolonged nature provides ample time for the killer to consider his actions"].)

Thus, we find sufficient evidence of Romo's premeditation and deliberation to support the jury's verdict of first degree murder.

Romo argues, based on the testimony of his neurologist and toxicologist, that "[h]e was concussed, brain damaged (and heavily intoxicated) at the time of the killing." But the People called their own

17

neurologist who challenged the opinions of the defense neurologist regarding Romo's purported concussion and its purported effects. The People's neurologist opined that even if Romo had sustained a concussion during the fight at the bar, that would not have explained his professed hours of memory loss. And the People established during the cross-examination of the defense toxicologist that he formed his opinion regarding Romo's level of intoxication (BAC) based solely on the self-serving information he gleaned from Romo.

In sum, in a sufficiency of the evidence review we are not permitted to weigh the conflicting evidence or to second-guess the judgment of the jury. (See *People v. Young, supra,* 34 Cal.4th at p. 1181 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact"].) Romo's various arguments do not change our analysis that there is sufficient evidence of premeditation and deliberation.

C. *Voluntary Manslaughter*

Romo claims that the People "failed to prove malice aforethought since this was a crime committed in the heat of passion and was therefore voluntary manslaughter." We disagree.

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (Pen. Code, § 187, subd. (a).) The required "malice may be express or implied. [¶] (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied when *no considerable provocation appears*, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188, subd. (a), italics added.)

One aspect of voluntary manslaughter involves a killing "upon a sudden quarrel or heat of passion." (Pen. Code, § 192, subd. (a).) "A defendant

18

commits voluntary manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to manslaughter." (*People v. Bryant* (2013) 56 Cal.4th 959, 968.)

In a voluntary manslaughter (heat of passion) defense: "The focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly." (*People v. Najera* (2006) 138 Cal.App.4th 212, 223.) A "trial court has a sua sponte duty to instruct on voluntary manslaughter as a lesser included offense of murder [where] there is evidence from which a reasonable jury could conclude that" adequate provocation was present. (*People v. Thomas* (2013) 218 Cal.App.4th 630, 643.) When a defendant puts provocation at issue by making a sufficient showing to raise a reasonable doubt, the prosecution must prove malice beyond a reasonable doubt by proving sufficient provocation was lacking. (*Ibid.*)

A homicide may be reduced to voluntary manslaughter "if *the killer's reason* was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an *"ordinary [person]* of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'"" (*People v. Breverman* (1998) 19 Cal.4th 142, 163, italics added, disapproved on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.) That is, the defense has both subjective and objective elements: *the defendant* actually killed in the heat of passion (the subjective element); and the circumstances giving rise to the heat of passion—the provocation—would arouse passion in the mind of an *ordinarily reasonable person* in similar circumstances (the objective element). (*People v. Steele* (2002) 27 Cal.4th 1230, 1253.)

Here, the same facts that support a finding that Romo acted with

premeditation and deliberation support a finding that Romo acted with express malice (that he intended to kill Mirelle by choking her to death). (See *People v. Smith* (2005) 37 Cal.4th 733, 741 ["it is well settled that intent to kill or express malice, . . . may in many cases be inferred from the defendant's acts and the circumstances of the crime"].) Further, the same facts also support a finding that Romo acted with implied malice. That is, the natural consequences of choking a person for more than a minute is that the victim is likely to perish. (See *People v. Bloom*, *supra*, 48 Cal.3d at p. 1208 ["Evidence of a defendant's state of mind is almost inevitably circumstantial"].)

In short, we find sufficient evidence to support the jury's implicit findings that Romo acted with express or implied malice. Thus, we again affirm Romo's first degree murder conviction.

Romo argues that he was sufficiently provoked and is entitled to a verdict of voluntary manslaughter (heat of passion) because on the night that he killed Mirelle, he "saw the victim's phone and saw she had been communicating with another man." We disagree.

As far as the subjective element of voluntary manslaughter, Romo testified on direct examination that he had no memory of what occurred. Therefore, Romo's testimony provided no evidence whatsoever that he was subjectively provoked into killing Mirelle.

Further, on cross-examination, Romo was asked if Mirelle had the right to communicate with other men on the night she was killed and he said, "She has the right to do whatever she wants." And when pressed by the prosecutor on whether Mirelle's talking to another man would have enraged him, Romo said that "it *might* bother me." (Italics added.)

In sum, Romo's testimony that he *might be bothered* by seeing Mirelle's text messages from another man does not provide adequate

evidence of subjective provocation, or heat of passion. (See *People v. Borchers* (1958) 50 Cal.2d 321, 329 ["According to dictionary definition, 'passion' may be any 'Violent, intense, high-wrought, or enthusiastic emotion'"].)

Further, even if there was sufficient evidence to establish the subjective component of involuntary manslaughter (heat of passion), there was insufficient evidence of objective provocation. That is, no reasonable juror could have determined that Romo's viewing of text messages from another man on Mirelle's phone would have established the kind of provocative conduct that "would cause an *ordinary person* of average disposition to act rashly or without due deliberation and reflection."[3] (See *People v. Manriquez* (2005) 37 Cal.4th 547, 583–584, italics added.)

As the trial court instructed the jury: "It is *not* enough that the defendant simply was provoked. *The defendant is not allowed to set up his own standard of conduct.* You must decide whether the defendant was provoked *and whether the provocation was sufficient*. In deciding whether the provocation was sufficient, consider whether a person *of average disposition*, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." (CALCRIM No. 570, italics added.)

In other words, even if we were to presume that the jury found

---

[3] Romo does not appear to be arguing on appeal that on the night of March 17, 2023, he saw on Mirelle's phone the video of her engaging in a sexual act with another man. Indeed, the security guard testified at trial that Romo was looking at Mirelle's phone, and Romo then said to Mirelle that "'you have guys hitting on you.'" J.W. also testified that Romo had Mirelle's phone in his hand, and he heard Romo say that he was upset that Mirelle "had been texting a guy or something."

In any event, even if Romo had made this argument, we would still find sufficient evidence that objective provocation was lacking. (Compare *People v. Manriquez, supra,* 37 Cal.4th at pp. 585–586; *People v. Najera, supra,* 138 Cal.App.4th at pp. 215–216.)

Romo was *subjectively* provoked, then we find sufficient evidence to support the jury's further implied finding that his claimed provocation was not *objectively* reasonable. (See *People v. Fenenbo*ck (1996) 46 Cal.App.4th 1688, 1704–1705 ["Generally, it is a question of fact for the jury whether the circumstances were sufficient to arouse the passions of the ordinarily reasonable person"]; compare *People v. Manriquez, supra,* 37 Cal.4th at pp. 585–586 [insufficient evidence of provocation where victim called defendant a "mother f*cker" and taunted him]; *People v. Najera, supra,* 138 Cal.App.4th at pp. 215–216 [insufficient evidence of provocation where victim called defendant a "'f*ggot'" and pushed him to the ground].)

To reiterate and conclude, we find sufficient evidence to support Romo's first degree murder conviction.

## III.
## DISPOSITION

The judgment is affirmed.

MOORE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


GOODING, J.

22